**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 22, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

JOEL HERRERA,

      Plaintiff - Appellant,

v.

UNITED AIRLINES, INC.,

      Defendant - Appellee.

No. 17-1453
(D.C. No. 1:16-CV-01951-DME-KMT)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **BACHARACH**, and **CARSON**, Circuit Judges.

    In this employment discrimination case brought under Title VII of the Civil Rights Act of 1964 (Title VII), Plaintiff-Appellant Joel Herrera argues his former employer, Defendant-Appellee United Airlines, Inc. (United), unlawfully terminated his employment because of his Hispanic national origin. Herrera appeals the district court's grant of summary judgment in favor of United. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.[1]

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Herrera's appendix is deficient. See Fed. R. App. P. 30.1(B)(3). The appendix omits numerous documents relevant to our decision, including many documents that Herrera relies on in his arguments, such as: (1) United's Working Together Guidelines;

(Continued . . .)

# I

### A) *Herrera's Employment at United*

Herrera is of Hispanic national origin. App. at 17. He began his employment with United in July 1989. D. Ct. Dkt. 27, at 2; D. Ct. Dkt. 30, at 3. From 1989 to 1998, Herrera worked at the Oakland International Airport. Id. In 1998, Herrera transferred to Denver International Airport (DIA), where he continued working as a Mechanic until his termination in 2015. Id.

### B) *Herrera is Convicted of DWAI and Sentenced to Jail*

In late September 2014, Herrera was arrested for driving under the influence. D. Ct. Dkt. 27, at 3; D. Ct. Dkt. 30, at 3. Herrera reported his arrest to United's local Operating Manager, Mark Moore. App. at 17. While Herrera's state court proceedings were ongoing, Moore and Herrera had multiple conversations about the possibility that Herrera could be sentenced to jail and permitted by the court to participate in work release. Id. at 34.

---

(cont'd)
(2) documents regarding Herrera's conviction and sentence; (3) Herrera's termination letter from United; (4) summaries following interviews with Marty Mock, Jim Schneider, and Mark Leber; (5) a document regarding Byron Coffey's successful termination of 180 days' in-home detention; (6) a letter from United regarding Mock's days off work; and (7) a document regarding William Bragg's agreement between United and the Sheriff's Office as to work furlough.

Based on this deficiency, we could simply decline to consider the merits of Herrera's appeal. See 10th Cir. R. 10.3(b) ("The court need not remedy any failure by counsel to designate an adequate record. When the party asserting an issue fails to provide a record sufficient for considering that issue, the court may decline to consider it."). However, in order to decide Herrera's appeal on the merits, we obtained the necessary documents from the district court's docket, to which we cite.

In June 2015, Herrera was convicted in the Arapahoe County Court of Driving While Ability Impaired (DWAI) with two or more prior convictions. D. Ct. Dkt. 27, at 3; D. Ct. Dkt. 30, at 3. In late August 2015, Herrera was sentenced to six months in county jail, App. at 7, sixty days of which was a mandatory minimum period of incarceration, id. at 17. The state court authorized work release, which allowed Herrera to leave jail to attend work. Id. at 32. Work release was accompanied by certain conditions, including: (1) United's approval of Herrera's participation in the program; (2) Herrera being fitted with an ankle monitor; and (3) installation of an interlock device in Herrera's vehicle. Id. at 17–18.

*C) United Denies Work Release and Fires Herrera*

Following his sentencing hearing, Herrera officially requested work release approval from Mario Terenzio, United's Director of Aircraft Maintenance at DIA. D. Ct. Dkt. 27, at 4; D. Ct. Dkt. 30, at 4. Terenzio contacted Linda Ross, United's Human Resources Manager of Technical Operations for Chicago and Denver, to explain the nature of the work release program and to seek her direction on how to proceed. Id.

In early September 2015, Terenzio, other United management personnel, and Herrera met in person at DIA to discuss Herrera's request for United to approve his participation in the work release program. Id. At the meeting, United placed Herrera on paid leave pending its decision to approve or deny Herrera's work release request. See D. Ct. Dkt. 27-1, at 17. After the meeting with Herrera, Terenzio contacted Ross to describe information learned during the meeting and to seek further guidance. D. Ct. Dkt. 27, at 5; D. Ct. Dkt. 30, at 4.

3

Thereafter, Ross conducted research regarding Herrera's work release request because she "was unaware of any United employee who had been provided work release." Id. Ross was unable to identify an instance where a United employee had sought work release approval, and concluded United had never accepted or denied an employee's work release request. Id.

United then denied Herrera's work release request and immediately terminated his employment. App. at 7. Herrera learned about his termination by letter dated September 29, 2015. Id. The termination letter noted that Herrera violated United's "Working Together Guidelines." D. Ct. Dkt. 27-5, at 2. The letter stated, "United's Working Together Guidelines instruct and bind each employee" to "[b]e responsible corporate citizens and abide by local, state[,] and federal laws"; "[u]se good judgment and open communication in all decisions"; and "[a]ct in ways that reflect favorably on the Company[,] yourself[,] and your co-workers." D. Ct. Dkt. 27-5, at 1. The letter also stated that "the Working Together Guideline on 'Working Dependably' requires . . . [r]egular and predictable attendance," and emphasizes that "[e]xcessive absences can impede the airline's ability to provide on-time and reliable service." Id. at 2. United determined that it "does not support the work release program which impacts [Herrera's] ability to report to work." Id. Thus, "taking into consideration the seriousness of [Herrera's] actions, [his] disregard for the Company's policies and guidelines, and [his] inability to report to work absent a work release requirement," United terminated Herrera's employment. Id.

4

Four months later, in January 2016, Herrera filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the EEOC). The EEOC sent him a Notice of Right to Sue at the beginning of August 2016, and Herrera sued United in the United States District Court for the District of Colorado. App. at 6. Following discovery, the district court granted United's motion for summary judgment on Herrera's national origin discrimination claim and entered final judgment in the case. Herrera now appeals.

## II

### A) Issues on Appeal

Herrera raises two issues on appeal. First, he contends that the district court incorrectly granted summary judgment to United. Herrera argues that the district court "erred in applying unduly restrictive criteria for similarly situated comparators," and that he put forth enough evidence of pretext to survive summary judgment. Aplt. Br. at 1. Second, Herrera asserts that the district court erred in failing to properly consider three pieces of evidence he offered in support of his opposition to summary judgment. According to Herrera, this "violat[ed] the requirement that all evidence be considered in the light most favorable to the non-moving party." Id.

Nothing in the district court's evidentiary rulings impacts our consideration of the merits of Herrera's discrimination claim, so we evaluate Herrera's appeal of the district court's grant of summary judgment first and the evidentiary issues second. Because we conclude that Herrera does not provide sufficient evidence of discriminatory intent to

survive summary judgment, and none of the challenged evidentiary rulings affect that determination, we affirm the district court's grant of summary judgment to United.

*B) Standard of Review*

This court reviews a grant of summary judgment de novo, applying the same legal standard used by the district court under Federal Rule of Civil Procedure 56(a). Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 997 (10th Cir. 2011). We affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1138 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit. An issue is 'genuine' if a 'rational jur[or] could find in favor of the nonmoving party on the evidence presented.'" Adams v. Am. Guarantee & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000) (alteration in original) (citation omitted) (quoting EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

*C) Title VII and the McDonnell Douglas Framework*

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff bringing a Title VII claim for disparate treatment on the basis of national origin "must prove by a preponderance of the evidence

6

that the defendant had a discriminatory motive or intent." Sorensen v. City of Aurora, 984 F.2d 349, 351 (10th Cir. 1993). A plaintiff may do this by offering direct proof of discriminatory intent or by using the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to demonstrate discrimination using circumstantial evidence. Horizon/CMS Healthcare Corp., 220 F.3d at 1191.

Herrera does not have direct evidence of discrimination, so he employs the McDonnell Douglas burden-shifting framework. Under McDonnell Douglas, Herrera must first establish a prima facie case of discrimination. 411 U.S. at 802. If he succeeds in doing so, the burden shifts to United "to rebut the presumption of discrimination" by "producing 'some evidence that it had legitimate, nondiscriminatory reasons for the decision.'" Sorensen, 984 F.2d at 352 (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986 (1988)). If United "succeeds in rebutting the presumption of discrimination raised by [Herrera's] prima facie case, then . . . . [Herrera] must prove by a preponderance of all the evidence in the case that the legitimate reasons offered by [United] were a pretext for discrimination." Id. At every stage, Herrera always retains "[t]he ultimate burden of persuading the trier of fact that [United] intentionally discriminated against [him]." Watson, 487 U.S. at 986 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

### D) Analysis: United's Motion for Summary Judgment

Herrera successfully establishes a prima facie case of discrimination. And United effectively articulates legitimate, nondiscriminatory motives for its employment actions. Herrera fails, however, to demonstrate that United's stated reasons are pretextual, and he

7

therefore does not establish that United intentionally discriminated against him. The district court properly granted summary judgment to United.

### 1) Herrera's Prima Facie Case of Discrimination

To establish his prima facie case of national origin discrimination, Herrera "must show that (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." Rivera v. City & Cty. of Denver, 365 F.3d 912, 920 (10th Cir. 2004) (quotation omitted). At this stage, Herrera's "burden is 'not onerous.'" Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005) (quoting Burdine, 450 U.S. at 253).

Herrera has met his burden of establishing a prima facie case, and United appropriately does not argue otherwise. First, Herrera belongs to a protected class because he is of Hispanic national origin. Second, United does not challenge Herrera's claim that he was qualified for his job. Third, despite his qualifications, United discharged Herrera. Finally, United did not eliminate Herrera's job after his discharge. Herrera has thus met his burden of establishing a prima facie case of discrimination, and the burden shifts to United to articulate a legitimate, nondiscriminatory reason for its employment actions.

### 2) United's Legitimate, Nondiscriminatory Reason

United's burden at this stage "is one of production, not persuasion." Reeves v. Sanderson Plumbing Prods., Inc. 530 U.S. 133, 142 (2000). This "burden is exceedingly light." DePaula v. Easter Seals El Mirador, 859 F.3d 957, 970 (10th Cir. 2017) (quotation omitted). United must only "explain its actions against [Herrera] in terms that

8

are not facially prohibited by Title VII." Jones v. Denver Post Corp., 203 F.3d 748, 753 (10th Cir. 2000). United does not "need to litigate the merits of [its] reasoning, . . . prove that the reason relied upon was bona fide, . . . [or] prove that the reasoning was applied in a nondiscriminatory fashion." EEOC v. Flasher Co., 986 F.2d 1312, 1316 (10th Cir. 1992). Moreover, we do not question "whether [United's] proffered reasons were wise, fair[,] or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." Rivera, 365 F.3d at 924–25 (quotation and alterations omitted).

Because United's denial of Herrera's work release and its ultimate decision to terminate his employment are interrelated, we consider United's stated reasons for both of those actions. United stated that it terminated Herrera because of "the seriousness of [his] actions, [his] disregard for the Company's policies and guidelines, and [his] inability to report to work absent a work release requirement." D. Ct. Dkt. 27-5, at 2. And United stated that it denied Herrera's request for work release

> principally based on [his] inability to freely perform his responsibilities without the restrictions inherent in a work release program, the risk that [Herrera] would not be able to predictably attend work during his incarceration and while on work release, the fact that if work release was approved for [Herrera] than [sic] it would need to be considered and potentially approved for all of United's 85,000 employees[,] and the fact that Ms. Ross'[s] research did not reveal any United employee who had been provided work release.

App. at 43.

These are legitimate, nondiscriminatory reasons for United's employment decisions. See Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1396 (10th Cir. 1997) (concluding defendant's statement that it terminated plaintiff for violating company

9

policy was a legitimate, nondiscriminatory reason for its employment action). United has thus met its burden of articulating a nondiscriminatory reason for its denial of Herrera's work release request and termination of his employment. The burden now shifts back to Herrera "to prove by a preponderance of the evidence that the legitimate reasons offered by" United "were not its true reasons, but were a pretext for discrimination." Simmons v. Sykes Enters., Inc., 647 F.3d 943, 947 (10th Cir. 2011).

### 3) Herrera's Evidence of Pretext

At the third and final step of the McDonnell Douglas framework—the pretext inquiry—"the presumption of discrimination created by" Herrera's "prima facie case 'simply drops out of the picture.'" Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)). At this step, Herrera "carries the full burden of persuasion to show that" United "discriminated on the illegal basis of" national origin. Id. (quoting Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005)).

"A plaintiff shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Id. (quotation omitted). A common method of showing pretext is by arguing disparate treatment. Id. This is the method Herrera employs.

Under this approach, a plaintiff can establish pretext by "demonstrat[ing] that the employer treated the plaintiff differently from other similarly-situated employees who

10

violated work rules of comparable seriousness." Id. at 1167–68 (quotation and alterations omitted). However, even if a plaintiff demonstrates disparate treatment, "if the employer's differential treatment of similarly-situated employees is 'trivial or accidental or explained by a nondiscriminatory motive,' such treatment is insufficient to create an inference of discrimination." Id. at 1168 (quoting Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1232 (10th Cir. 2000)). "[T]he existence of differential treatment[] defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive; where the evidence of pretext supports only nondiscriminatory motives, such an inference is logically precluded and summary judgment for the employer is appropriate." Id.

Herrera offers for comparison five individuals who he claims were similarly situated to him yet treated differently—Marty Mock, Mark Leber, James Schneider, Byron Coffey, and William Bragg.[2] Four of the men—Mock, Leber, Schneider, and Coffey—are proper pretext comparators.[3] Bragg is not.

_____

[2] Herrera also discusses Ed Avila, a purportedly Hispanic individual who, Herrera argues, was treated similarly poorly to him. However, because Avila is in Herrera's protected class, he cannot serve as a proper comparator. See Aramburu v. Boeing Co., 112 F.3d 1398, 1405 (10th Cir. 1997) (noting that evidence that "does not reflect the ancestries of the other employees" who were treated more favorably "does not allow for a comparison which supports an inference" of discrimination on the basis of national origin).

[3] In this regard, the district court erred in holding that Mock, Leber, Schneider, and Coffey were invalid comparators because Herrera did not provide evidence that these men were allowed to participate in work release while he was not. To the contrary, Herrera was not required to show that a nonprotected United employee was allowed to participate in work release to establish he was a proper comparator. See, e.g., Aramburu,

(Continued . . .)

11

For an individual to be "similarly situated" to Herrera, he must have: (1) "deal[t] with the same supervisor," and (2) been "subject to the same standards governing performance evaluation and discipline." Aramburu, 112 F.3d at 1404 (quotation omitted). It is undisputed that Mock, Leber, Schneider, and Coffey worked at DIA as Aviation Mechanics, like Herrera, and at the same time as Herrera. They all had the same supervisor, Terenzio, and were all "subject to the same standards governing performance evaluation and discipline"—United's Working Together Guidelines. Id. Thus, Mock, Leber, Schneider, and Coffey are all "similarly situated" to Herrera. Id. Bragg, however, did not work at DIA. App. at 20. He worked for United at the San Francisco International Airport. Id. Bragg did not "deal with the same supervisor" as Herrera. Aramburu, 112 F.3d at 1404 (quotation omitted). He is thus not "similarly situated" to Herrera and not an appropriate comparator.[4] Id.

_____

(cont'd)
112 F.3d at 1404. Nevertheless, despite wrongly believing they were invalid comparators, the district court still considered Mock, Schneider, Leber, and Coffey in its disparate treatment analysis. See App. at 44 ("Herrera has been unable to offer even a single instance where United supported a non-Hispanic employee's work release request. Nonetheless, because the comparators Herrera does identify are critical to his claim, the Court will pause to dwell on the facts that were discovered as to each of these individuals.").

[4] We could also decline to consider evidence related to Bragg because Herrera inadequately presented his arguments regarding Bragg to the district court. In its ruling on United's motion for summary judgment, the district court noted that Herrera "d[id] not mention" Bragg "in the text of his response" to United's summary judgment motion, but merely "reference[d] . . . Bragg[ ] in his Statement of Undisputed facts, and attache[d] an 'Alternative Sentencing Burau [sic] Employer's Agreement,' . . . which Herrera suggest[ed] [wa]s evidence that Bragg . . . 'received approval from United for continuing his employment while on work release." App. at 46. Because Herrera did not adequately
(Continued . . .)

12

In order to establish pretext by showing differential treatment, Herrera must show that: (1) his nonprotected similarly-situated colleagues violated United "rules of comparable seriousness"; (2) United treated them differently (by, for example, not terminating their employment, as it did with Herrera); and (3) this differential treatment is not trivial, accidental, or explained by nondiscriminatory motives. Kendrick, 220 F.3d at 1230. Herrera fails on the third prong.

Herrera, Schneider, Coffey, Mock, and Leber all "violated work rules of comparable seriousness." Id. Herrera, Schneider, and Coffey were all arrested for DUI. Mock was arrested for DWAI. Finally, Leber was arrested for domestic violence. All of these arrests and associated convictions resulted in violations of work policies "of comparable seriousness" by Herrera and the comparators. Kendrick, 220 F.3d at 1232. These include the Working Together Guidelines' directives that all United employees: (1) "[b]e responsible corporate citizens and abide by local, state and federal laws"; (2) "[u]se good judgment . . . in all decisions"; and (3) "[a]ct in ways that reflect favorably on the Company[,] yourself[,] and your co-workers." D. Ct. Dkt. 27-5, at 3.

Herrera establishes that United treated him differently than his identified comparators because Herrera was the only one of the five men whose employment was

_____

(cont'd)
present to the district court any arguments that Bragg was a proper comparator, those arguments are not properly preserved. See Tele-Comm., Inc. v. C.I.R., 104 F.3d 1229, 1233 (10th Cir. 1997) ("Propounding new arguments on appeal in an attempt to prompt us to reverse the trial court undermines important judicial values. In order to preserve the integrity of the appellate structure, we should not be considered a 'second-shot' forum, a forum where secondary, back-up theories may be mounted for the first time.").

terminated. However, because United's differential treatment of Herrera can be explained by a nondiscriminatory motive—namely, United's desire not to approve Herrera for the work release program—Herrera cannot establish pretext through disparate treatment.

Mock, like Herrera, pled guilty to DWAI. Unlike Herrera, however, Mock did not receive a jail sentence, but was required to wear an ankle monitor for ten days. Mock could wear his monitor undetected and complete his sentence without informing United and without interrupting his regular work schedule. Mock did not work for six of the ten days he wore the ankle monitor, because he used vacation days and had scheduled days off of work. For the remaining four days, Mock went to work as normal and secretly wore the ankle monitor under his uniform. App. at 19 (stating Mock "did not inform any United management employee" that he was wearing an ankle bracelet). Unlike Herrera, United did not need to decide whether it would approve a court-authorized program related to Mock's conviction. Thus, United's differential treatment of Herrera and Mock is explained by its statement that it terminated Herrera's employment in part because of his "inability to report to work absent a work release requirement." D. Ct. Dkt. 27-5, at 4.

United's treatment of Leber is likewise explained by nondiscriminatory reasons. Leber was convicted on a domestic violence charge. He, like Mock, was sentenced to wear an ankle monitor. Also like Mock, Leber wore his ankle monitor to work. Leber "could not definitively recall whether he ever informed anyone at United management . . . that he was wearing an ankle bracelet under his uniform." App. at 46 (quotation

14

omitted). Leber stated "he is relatively certain that a number of his co-workers knew he was wearing an ankle bracelet," but "he was not proud of his status," "did not discuss the matter with his co-workers," and "did his best to hide the bracelet so it was not seen at work." Id. (quotation omitted). Thus, as with Mock and unlike Herrera, United made no decision about whether to authorize a court-administered program related to Leber's conviction.

Schneider, like Herrera and unlike Mock and Leber, was sentenced to jail time. Unlike Herrera, Schneider had a lot of vacation time in reserve. Schneider used seventy-one vacation days to cover ninety-three percent of his seventy-five-day sentence.[5] For the four days of Schneider's sentence that were not covered by his vacation days, United marked Schneider absent from work under the "N/A" designation. United disciplined Schneider for his four days of absence by issuing him a "strike" in the attendance discipline program. App. at 45. Schneider was entitled to use his vacation days, provided his time off was approved by United, and the record evidence does not reveal if United knew Schneider was spending seventy-one vacation days in jail. Moreover, Schneider was disciplined for the additional four days that he was absent in accordance with United's policy. Therefore, like Mock and Leber, and unlike Herrera, Schneider did not have to seek United's approval of his participation in the work release program to serve his sentence. Thus, United's differential treatment of Schneider is also explained by nondiscriminatory reasons.

---

[5] "Herrera . . . had enough vacation time to cover only fourteen days of absence, and his mandatory minimum sentence was sixty days." App. at 48.

15

There is little record evidence about Coffey. We know "Coffey was sentenced to 180 days of home detention." Id. at 20. We also know Coffey "successfully completed his sentence," and United did not terminate his employment. Id. Herrera points to no evidence, however, that tells us *when* Coffey served his home-detention sentence, the terms of that sentence, or if United knew of it. Herrera also identifies no admissible evidence establishing that Coffey is non-Hispanic.[6] Without this evidence, Herrera cannot show that United unlawfully discriminated against him by treating a nonprotected employee (ostensibly Coffey) differently than it treated a protected employee (Herrera). Herrera's attempt to rely on United's disparate treatment of Coffey to support a finding of discrimination fails.

Herrera provides no evidence from which we can conclude that any of the comparators he identifies in support of his pretext argument were treated differently in a way that demonstrates such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [United's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Swackhammer, 493 F.3d at 1167 (quotation omitted). Herrera has not proven "by a preponderance of the

---

[6] Herrera argues that "United has never contested that fact that [Coffey is a] white, non-Hispanic m[a]n." Aplt. Br. at 11 n.3. Even if that were true, the burden was on Herrera to set forth admissible evidence of Coffey's protected or nonprotected status at this stage of litigation. Regardless, even if Coffey was of nonprotected national origin, Herrera produced no evidence from which a reasonable juror could conclude that Coffey's home detention sentence occurred during his employment at United or that, if it did occur during his employment, United knew of and authorized it.

16

evidence that the legitimate reasons offered by" United "were not its true reasons, but were a pretext for discrimination." Simmons, 647 F.3d at 947. The district court appropriately granted summary judgment for United.

*E) Evidentiary Issues*

Herrera raises three evidentiary issues on appeal. "At the summary judgment stage, we review a district court's evidentiary ruling for abuse of discretion." Jones v. Barnhart, 349 F.3d 1260, 1270 (10th Cir. 2003). First, he argues that the district court incorrectly "declined to fully consider" memoranda United's labor relations staff prepared of interviews that United conducted with Mock, Lieber, and Schneider. Aplt. Br. at 20–21. Second, Herrera argues that the district court improperly "took issue with the admissibility and relevance" of a document related to Bragg titled "Alternative Sentencing Burau [sic] Employer's Agreement." Id. at 21. Finally, he argues that the district court incorrectly "suggested that the Douglas County criminal justice document" Herrera submitted to show that Coffey served a home detention sentence was inadmissible. Id.

As to Herrera's first asserted error, although the district court noted that the interview memoranda "were not presented to the Court in a form admissible into evidence," App. at 45 n.6, the district court repeatedly referred to the memoranda in its order granting United's motion for summary judgment, id. at 45–48. Therefore, despite the district court's statement that the interviews were not presented in an admissible form, it is apparent that the district court considered the interviews in its analysis. Regardless, nothing in the memoranda changes our ruling that Herrera failed to establish pretext.

17

Herrera next argues that the district court improperly failed to consider the document he offered titled, "Alternative Sentencing Burau [sic] Employer's Agreement" with Bragg. The district court stated in its ruling that "this agreement may be inadmissible hearsay, although it is possible it could be admissible under the government records exception." Id. at 46–47 n.9. Because we have already determined that Bragg does not qualify as a comparator for Herrera's disparate treatment claim, Bragg's Alternative Sentencing Agreement is not relevant, and we need not determine whether the district court's ruling on this document constituted abuse of discretion.

Finally, Herrera argues "the district court [incorrectly] suggested that the Douglas County criminal justice document" about Coffey, titled, "Electronic Monitoring Successful Termination Report," which Herrera attached to his response to United's motion for summary judgment, "is inadmissible." Aplt. Br. at 21. However, the district court discussed the document's significance in its disparate treatment analysis. App. at 48–49. And, as the district court correctly noted, nothing in the report indicates that Coffey's home detention "corresponded with Coffey's employment with [United], that [United] knew of such in-home detention, or even that . . . Coffey is non-Hispanic." App. at 49.

18

III

For the reasons discussed above, we AFFIRM the district court's grant of summary judgment to United.

Entered for the Court

Mary Beck Briscoe
Circuit Judge