FILED
United States Court of Appeals
Tenth Circuit

November 5, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHAEL L. LOBATO,

               Plaintiff - Appellant,

    v.

STATE OF NEW MEXICO
ENVIRONMENT DEPARTMENT;
ENVIRONMENTAL HEALTH
DIVISION; CARLOS ROMERO;
CHARLES LUNDSTROM;
SOLOMON ROMERO; JOHN
RHODERICK; DAVID TORRES;
NORMAN NORVELLE; and JUDY
BENTLEY,

               Defendants - Appellees.

No. 12-2128

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 09-CV-01203-BB-ACT)**

---

Repps D. Stanford (Christopher M. Moody with him on the briefs) Moody &
Warner, P.C., Albuquerque, New Mexico, for Appellant.

Bryan C. Garcia (Henry F. Narvaez with him on the brief) Narvaez Law Firm,
P.A., Albuquerque, New Mexico, for Appellees.

---

Before **TYMKOVICH**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Michael Lobato was a probationary employee at the New Mexico Environmental Department's Farmington office. His status as a probationary employee meant he could be fired at will and without a right to appeal the decision, so long as the department's reasons were provided in writing. Before completing his probationary period, Lobato was fired. In a letter explaining its decision, NMED cited Lobato's dishonesty, failure to cooperate with management, and unprofessional attitude toward coworkers and the public.

Lobato, who is Hispanic and of Mexican ancestry, alleges that these proffered rationales were pretextual and that NMED was in fact motivated by racial and national origin prejudice. He also alleges NMED wanted to punish him for whistleblowing. Thus, Lobato claims, the dismissal violated his rights under Title VII, New Mexico's civil rights and whistleblower laws, and the First Amendment.

The district court granted summary judgment to NMED on all claims, and we agree with that decision. Lobato has failed to raise a genuine dispute that NMED's decision to terminate him was motivated by anything other than the legitimate, nondiscriminatory reasons NMED offered in its termination letter. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

# I. Background

## A. Preliminaries

On December 29, 2007, NMED hired Lobato as a probationary employee for a position as an Environmental Scientist and Specialist in its office in Farmington, New Mexico. His position concerned primarily the inspection of food service providers, liquid waste systems, and public swimming pools. Pursuant to the published State Personnel Board Rules governing NMED and its staff, a probationary employee could be "suspended, demoted, or dismissed effective immediately with written notice and without right of appeal to the Board." App. 90.

Lobato's direct supervisor when he began working at NMED was Salvadore Misseri, the staff manager for the Farmington office, which was in District V. Misseri reported to District V's manager, Charles Lundstrom. In turn, Lundstrom reported to Carlos Romero, the Director of NMED. Additionally, many of the personnel matters relevant here were handled by the Chief of the NMED Human Resources Bureau, Judy Bentley.

## B. Whistleblowing

Around February 2008, Lobato observed irregularities in the way Misseri conducted his duties at the Farmington office, and Lobato reported these

irregularities to management.[1]  For instance, he alleged that Misseri was giving

special privileges to certain contractors regulated by NMED in exchange for cash.

Lobato's allegations prompted NMED to place Misseri on paid

administrative leave, hire an independent private investigation firm to look into

the matter, and place Salomon Romero in charge of the Farmington office during

the investigation.[2]  Eventually, as a result of the investigation, HR chief Bentley

gave Misseri a notice of contemplated termination, and Misseri resigned.

### C. *Alleged Discrimination*

Lobato alleges that, on one occasion while he was at a job site with

Misseri, a contractor used a racial slur against Lobato.  Misseri did nothing in

response, and when Lobato told Lundstrom about the encounter, Lundstrom made

light of the incident.

Lobato further alleges that Lundstrom referred to him in derogatory terms

when speaking with other NMED employees and once called him a "f***ing

Mexican" to his face.  *Id*. at 384.  While NMED denies these allegations of racial

animus, it is undisputed that Lundstrom and Lobato had a strained relationship.

---

[1]  In reviewing the district court's grant of summary judgment, we recite the facts presented in the light most favorable to Lobato, the nonmoving party. *See Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1171 (10th Cir. 2013).

[2]  Nothing in the record indicates that Salomon and Carlos Romero, NMED's Director, were kin.

### D. *Conflict with Management*

In June 2008, Bentley began investigating numerous complaints involving personnel in District V. As part of this investigation, she interviewed Lobato and sent him a list of follow-up questions. Some of the questions focused on the problems Lobato said he was having with Lundstrom. Others focused on Lobato's request to be reimbursed for a hotel stay when he had also turned in a receipt for a breakfast purchased that next morning 300 miles from the hotel. In a series of emails and phone calls, Lobato repeatedly promised to answer Bentley's questions, but he never did—even after Bentley and Carlos Romero repeatedly asked for his cooperation.

When Bentley concluded her investigation into Lobato's complaints against Lundstrom and Lobato's fraudulent reimbursement request, she told Lobato, "I consider you non-compliant with my request for information regarding your complaints[;] therefore[,] I have concluded my investigation without your information and forwarded it to management." *Id.* at 440. She further noted, "I also consider you non-compliant with the investigation into complaints against you[,] and I have also completed that investigation and forwarded it to management." *Id.* There is no evidence of any further communication between Bentley and Lobato about his reimbursement request, nor is there evidence that Lobato ever responded to Bentley's questionnaire or to Bentley's concerns about his failure to cooperate.

Following the investigation, Carlos Romero and Bentley formally reprimanded Lundstrom for his management style and the way he interacted with Lobato and others in the Farmington office. Lobato reimbursed the State for the hotel room under protest, and no further action was taken against him at that time.

### E. Conflicts with Other Supervisors

In October 2008, Lobato filed an amendment to his EEOC charge, saying that a supervisor "directed [me] to move heavy items against department policy," and that this supervisor "attempted to deny me medical treatment for [the resulting] injury" and made derogatory statements against him. *Id.* at 332. Soon after, during a month-long sick leave for the resulting injury, Lobato visited his workplace and discovered that others were using his office and that his office was missing various items. He called the police and accused his direct supervisor at the time, Salomon Romero, of stealing the items from his office. The resulting police report says Lobato eventually remembered that he had in fact given one of the items to Salomon Romero before his sick leave. No arrests or charges were filed.

Later that fall, NMED selected Norman Norvelle as the new staff manager for the Farmington office. Norvelle replaced Salomon Romero, who had been the temporary replacement for Misseri. Thus, Norvelle became Lobato's new direct supervisor. Concerned about his job status, Lobato confronted Norvelle on December 5. Lobato alleges that, during the confrontation, Norvelle touched

Lobato's face with his finger. NMED disputes this allegation, saying that another employee witnessed the incident and reported that Norvelle never touched Lobato. In any event, Lobato called the police and pressed criminal battery charges against Norvelle—charges that were ultimately dismissed.

### F. *Lobato's Termination*

According to Carlos Romero, the incident involving Norvelle "was the trigger point" that made him decide to dismiss Lobato within the probationary period. *Id.* at 341. Romero emphasized that the decision to fire Lobato "was my decision all by myself," though he received advice from Bentley and legal counsel. *Id.* at 341.

Lobato was served with a notice of dismissal on December 17, 2008. In the notice, NMED relied on State Personnel Rule 1.7.11.11, which states:

> Probationers and employees in emergency or temporary status may be suspended, demoted, or dismissed effective immediately with written notice and without right of appeal to the Board. The written notice shall advise the employee of the conduct, actions, or omissions which resulted in the suspension, demotion, or dismissal.

*Id.* at 90. The notice then set forth five grounds for dismissal: (1) Lobato was untruthful in his employment application by failing to disclose he had left his position as an investigator at the public defender's office; (2) he lied about staying in a hotel in February 2008 in order to receive a per diem reimbursement; (3) he did not cooperate with the investigation related to the per diem matter; (4)

-7-

he disregarded orders from and argued with his supervisor Norvelle; and (5) he was rude or otherwise unprofessional to many NMED employees and to an unidentified member of the public.

## II. Analysis

Lobato contends his firing was motivated by racial and national origin bias and by NMED's desire to retaliate against him for both his whistleblowing and for his opposition to workplace discrimination. He raises four principal claims against NMED: (1) two separate claims under Title VII of the Civil Rights Act; (2) a claim under the New Mexico Human Rights Act, N.M. Stat. § 28-1-1 *et seq.*; (3) a claim under New Mexico's Whistleblower Protection Act, N.M. Stat. § 10-16C-1 *et seq.*; and (4) a First Amendment claim under 42 U.S.C. § 1983.

The district court granted summary judgment, and we review de novo.

### A. Title VII

Lobato raises two separate Title VII claims. First, he alleges that both discrimination and retaliation were motivating factors in Carlos Romero's decision to terminate him. Second, he argues that Lundstrom, as a biased subordinate, impermissibly influenced Romero in his decisionmaking and that Lundstrom's biased reporting was a proximate cause of Lobato's dismissal, regardless of whether Romero himself was motivated by the same bias.

The district court did not credit either of these theories of liability. First, the court concluded that the record evidence did not support Lobato's contention

that NMED's proffered reasons for his dismissal were in fact pretextual. Second, the court concluded that NMED insulated itself from Lundstrom's improper biases by conducting an independent investigation into Lobato's conduct. As we explain below, we substantially agree with the district court's reasoning on both Title VII theories.

### 1. Pretext

Title VII prohibits employers from discharging employees on account of race or national origin. It also forbids retaliating against an employee who reports or opposes violations of Title VII. *See* 42 U.S.C. § 2000e-2(a)(1); *id.* § 2000e-3(a).

We analyze this claim using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Lobato has the initial burden of establishing a prima facie case of discrimination, then the burden shifts to NMED to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Luster v. Vilsack*, 667 F.3d 1089, 1092 (10th Cir. 2011). If NMED can make such a showing, the burden shifts back to Lobato to show there is a genuine dispute about whether the proffered explanation was pretext for discrimination. *Id.*

The parties do not dispute the first two steps in the *McDonnell Douglas* framework. Our analysis thus turns on the third step—pretext.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotation marks omitted). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation." *Luster*, 667 F.3d at 1093 (internal quotation marks omitted). Thus, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.* at 1094.

Where, as here, an employer advances a number of reasons for an adverse employment action, we have adopted a "general rule" that "an employee must proffer evidence that shows each of the employer's justifications is pretextual." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005).

That said, we recognize several variations on this theme. For instance, a plaintiff might "cast[] substantial doubt on many of the employer's multiple reasons," giving reason to doubt them all. *Id.* (internal quotation marks omitted). We also recognize that "one of the stated reasons for termination [may] predominate[] over the others," so a showing that the dominant reason was

-10-

pretextual may be sufficient. *Id.* at 1127. Another alternative is showing that "the pretextual character of one explanation is so fishy and suspicious that a jury could find that the employer (or its decisionmaker) lacks all credibility." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005) (per curiam) (citation and internal quotation marks omitted). Or a plaintiff may be able to establish pretext by "discredit[ing] each of the employer's *objective* explanations, leaving only *subjective* reasons to justify its decision." *Id.* (emphasis added). All of which is to say, our inquiry is not mechanistic; it is designed to tease out factual questions that are legitimately in dispute. And summary judgment is appropriate where the plaintiff cannot demonstrate any genuine dispute of material fact for the jury to resolve.

With this framework guiding us, we turn to Lobato's evidence of pretext. Lobato points to five alleged inconsistencies in NMED's decision to terminate, and he suggests they demonstrate pretext either individually or in the aggregate. As we explain, Lobato has not established a genuine dispute about pretext.

### a. Progressive Discipline

Lobato first argues that NMED failed to follow its unwritten policy of using "progressive discipline"—*i.e.*, a rule that an employee must receive informal discipline such as a verbal warning or a letter before being terminated. For this argument to succeed, Lobato must show, first, that NMED had such a policy, and second, that NMED did not follow that policy when dismissing

-11-

Lobato.  *See Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000); *see also Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1119–20 (10th Cir. 2007).

Lobato cannot point to any written policy that said NMED mandated progressive discipline with probationary employees.  To the contrary, NMED's written policy stated that probationary employees were employed at will and could be fired for any lawful reason.  In particular, that policy, which was promulgated by the State Personnel Board, permitted probationary employees to be "suspended, demoted, or dismissed effective immediately with written notice and without right of appeal to the Board."  App. 90.

Further, Lobato cannot rely on NMED's treatment of other probationary employees to establish a general practice that probationary employees were entitled to progressive discipline.  Neither Bentley nor anyone else in management ever said that NMED had a mandatory policy of progressively disciplining any employees, probationary or otherwise.  Indeed, Bentley described five separate instances in which probationary employees were terminated for infractions she described as "of a similar nature to the conduct that resulted in Mr. Lobato's termination."  *Id.* at 125–26.  There is no indication that any of these probationary employees were given progressive discipline before termination.  Lobato has not challenged this testimony, nor has he pointed to

other instances where probationary employees have been treated differently from him after similar instances of misconduct.

Instead, Lobato points to Lundstrom's deposition in which Lundstrom says NMED practiced progressive discipline. When asked whether he was trained to progressively discipline probationary employees in particular, Lundstrom replies that he cannot recall a "separate training" for whether to progressively discipline probationary employees, but that he did not have the authority to hire or fire employees when he managed Lobato. App. 349. Lobato interprets this testimony as demonstrating that NMED had a rigid unwritten policy to first warn an employee in person or through a letter before formal discipline.

But this deposition testimony falls short of showing that NMED had an unwritten policy (contrary to its written policy) of requiring progressive discipline with probationary employees. In fact, Carlos Romero and Bentley affirmed, and the employment records demonstrated, that serious misconduct could lead to dismissal. And, in any event, Lundstrom, by his own admission, had no authority to dismiss employees during Lobato's employment.

Lobato also points to one statement by Carlos Romero in which Romero says it was his "practice generally" to talk to employees about inappropriate behavior and that "it would be important to get [Lobato's] side of the story" when addressing complaints against him. App. 345. Lobato claims these statements show that NMED had an official policy to inform employees about any problems

before taking disciplinary action, and that NMED had an official policy to ask for the employee's perspective when a co-worker complains about him.

But these comments do not show that NMED had a policy contrary to or conflicting with the state rule that probationary employees could be terminated at will. Indeed, Romero says nothing about whether his general practice applied specifically to probationary employees. And, in any event, NMED did attempt to get Lobato's side of the story, including Bentley's interview with Lobato about his per diem request and his complaints against management. There is no inconsistency here rising to the level of a genuine dispute about pretext.

We recognize in certain circumstances that an employer's practice of applying progressive discipline with more than just a few probationary and non-probationary employees could establish a policy that all employees should be progressively disciplined. Under such circumstances, a failure to follow progressive discipline, even with a probationary employee, might give rise to evidence of pretext.

But that is not the case here. Rather, the record shows that NMED did not deviate from applying its written policy to terminate probationary employees without additional process. And where "progressive discipline [is] entirely discretionary," and the employer "did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext." *Timmerman*, 483 F.3d at 1120. *Cf. Berry v. T-Mobile USA,*

*Inc.*, 490 F.3d 1211, 1223 (10th Cir. 2007) (finding no jury question whether an unwritten policy of progressive discipline existed because the employee handbook contained no reference to progressive discipline and "the evidence demonstrate[d] many employees were fired without progressive discipline").

In sum, even if Lobato was dismissed without prior discipline, that does not show pretext.

### b. *Falsified Résumé*

Lobato also alleges pretext in NMED's claim that he falsified his résumé. The NMED dismissal letter reports that both in his job application and during his November 2007 interview, Lobato said he was working as an investigator for the public defender's office. The letter alleges that these were false statements because Lobato had in fact quit his job with the public defender in August 2007.

Lobato does not contest that he left the public defender before his interview for the NMED job. Rather, he suggests that, when he submitted his résumé to NMED in January 2007, he was still employed at the public defender's office, and that, at his interview, he "was not asked and did not state that [he] was then still employed with the State Public Defender's Office." App. 325. Thus, he concludes that this proffered rationale for his dismissal must be pretextual because he was not technically untruthful in either his résumé or his interview.

We disagree. Even accepting Lobato's version of the facts, NMED had a good faith basis for concluding Lobato had misrepresented the truth. Bentley's

-15-

investigation revealed that Lobato's employment status at the time of hiring was not accurately reflected on his résumé—*i.e.*, his résumé said he was employed with a state agency at that time, but a search of the state's system showed he was not. And Lobato does not dispute that the résumé as it was reviewed in November 2007 was in fact inaccurate. "The relevant inquiry," we have explained, "is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Luster*, 667 F.3d at 1094 (internal quotation marks omitted). All Lobato has done is to allege that NMED might have relied on an unfair perception of the facts, not that NMED relied on that perception in bad faith. This is insufficient to establish pretext.

### c. *Expense Report*

Lobato also claims pretext in NMED's accusations that Lobato falsified an expense report and did not cooperate with an investigation into this matter. As the dismissal letter indicates, Lobato sought compensation for a night at a hotel in Albuquerque. Yet he then submitted a receipt for a breakfast he had purchased 300 miles away. Further, the hotel denied that Lobato had stayed there the night in question. Lobato eventually reimbursed the State for the charges, but only, according to the dismissal letter, "under protest." App. 434.

The letter also explains how, in June 2008, Bentley opened an investigation into Lobato's expense report discrepancies and solicited Lobato's cooperation.

-16-

From NMED's perspective, Lobato rebuffed this attempt by failing to respond to Bentley. Lobato suggested that he was having trouble answering questions because he was the only inspector in the Farmington office, but the dismissal letter indicates otherwise:

> [T]hree inspectors from other offices were in Farmington helping with inspections that week and had been going to the Farmington office to do inspections for over three months. In addition, your Supervisor, Salomon Romero was also there helping out that week and had been at the Farmington office every week doing inspections to keep up on the workload.

*Id.*

In sum, then, NMED's rationale for dismissal here is that Lobato (1) lied about staying in a hotel, (2) failed to cooperate with a subsequent investigation into the matter, and (3) lied in the course of his failure to cooperate.

Lobato concedes he was not entitled to the expense reimbursement but attempts to minimize the extent of his dishonesty by noting that he paid back the money. And, he maintains, the failure to comply with the investigation is the fault of his lawyer, who forgot to turn in the responses to Bentley's questions.

None of these arguments creates a material fact question as to pretext. As an initial matter, there is no genuine dispute that he was dishonest about staying in Albuquerque. And whatever Lobato's lawyer did or did not do has no bearing on NMED's justification for terminating Lobato. What matters in the pretext inquiry is what NMED knew, not what Lobato knew. *Luster*, 667 F.3d at

1093–94. Lobato does not allege that he ever informed Bentley or Romero about his attorney's purported failure to send responses, nor does he dispute that he failed to respond to Bentley's repeated requests for assistance with the investigation. Thus, Carlos Romero had an ample basis to conclude that Lobato did not cooperate with the expense report investigation.

Moreover, Lobato offers no response to Romero's undisputed contention that Lobato misled Bentley during the course of the expense report investigation by stating he was working alone in the Farmington office when in fact there were three other workers and one supervisor helping him. His failure to contest this fact further undermines his argument that NMED's expense account rationale was pretext for discrimination or retaliation.

Lastly, Lobato alleges that other employees with the same per diem problems were treated less harshly than he was. But he points to only one other such employee, and he offers no evidence that this other employee was also probationary or otherwise similarly situated with Lobato. Thus, this allegation is insufficient to establish pretext.

### d. Unprofessional Behavior

Lobato next contends that Romero's allegations of rudeness were pretextual. It is true that a number of current employees at NMED and Lobato traded accusations that the other was rude, driven by ulterior motives, or otherwise unpleasant. And NMED did state in its notice of dismissal that Lobato

was rude to Carlos Romero, Salomon Romero, Norvelle, another HR employee, and an unidentified member of the public.

But we need not enter this fray and determine whether the specific allegations here are genuinely in dispute or not. Even if we assume that there is a dispute, we can still conclude that Lobato failed to meet his burden of showing pretext. NMED apparently believed the other employees' accounts of interactions with Lobato, not Lobato's. We see no reason—and Lobato provides none—that NMED could not have believed in good faith its employees' complaints that Lobato was being rude.[3] Given Lobato's probationary status, NMED was entitled to factor in these allegations as grounds for dismissal.

### e. Temporal Proximity

Lastly, Lobato contends that the close temporal proximity between his dismissal and the dates of his allegedly protected activities demonstrate pretext for his Title VII retaliation claim.

We recognize that "temporal proximity" between the protected opposition activity and an adverse employment action "can contribute to an inference of discrimination." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 (10th Cir. 2008). But that is in the context of evaluating the plaintiff's prima facie case, which is

---

[3] The one exception may be complaints from Lundstrom, but those were explicitly disregarded by Carlos Romero in a letter to Lundstrom five months before Lobato's termination.

-19-

not at issue here.  The question here is whether temporal proximity alone also shows pretext.

It does not.  We have previously held that "temporal proximity is sufficient to establish a prima facie case, but *not* to establish pretext, because the evidentiary burden is different."  *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 n.6 (10th Cir. 2007) (emphasis added).  As we explained,

> The burden of establishing a prima facie case in the *McDonnell Douglas* framework is not onerous.  It is because of this relatively lax burden that we allow temporal proximity between a protected activity and an adverse action to establish a prima facie case; for the same reason, we have not imported this lessened standard to pretext analysis where the burden is more demanding and requires a plaintiff to assume the normal burden of any plaintiff to prove his or her case at trial.  Allowing very close temporal proximity to operate as a proxy for this evidentiary requirement would not further the substantive purposes of our inquiry at this stage.

*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) (citations and internal quotation marks omitted; alterations incorporated).  Thus, close temporal proximity can support a finding of pretext only in combination with other evidence of pretext.  *See id.*  Because we find no other indication of pretext, close temporal proximity alone is of no moment in this case.

Lobato also suggests that the *lack of* temporal proximity between the expense account investigation in June and July and his termination in December indicates pretext.  But NMED does not claim the per diem incident alone

triggered Lobato's termination. Rather, Carlos Romero testified that Lobato's confrontation with his supervisor Norvelle on December 5 was "the trigger point." App. 341. That the per diem incident occurred some five months before Lobato's termination is consistent with Romero's explanation that "a stream of many incidents [] cumulatively brought [the] decision [to terminate Lobato] to the forefront." App. 341. The dismissal letter reflects as much.

Lobato's temporal proximity arguments do not demonstrate pretext. More, Lobato has not raised any inconsistency, weakness, or contradiction in NMED's decision that would suggest to a reasonable factfinder that NMED's proffered reasons should be disbelieved. Hence, NMED is entitled to summary judgment on this claim.

We turn now to Lobato's second theory for Title VII liability.

### 2. Subordinate Bias (or "Cat's Paw") Liability

Lobato advances a second theory for Title VII liability: that Lundstrom's bias was the proximate cause of Lobato's termination.

In support of this theory, Lobato relies on the Supreme Court's decision in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011). *See generally EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484–88 (10th Cir. 2006) (background on subordinate bias liability). In *Staub*, an army reservist brought a claim that he was fired because of his employer's hostility toward his military

-21-

obligations, a violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), which mirrors Title VII.[4]

Staub's theory of unlawful discrimination was not that the HR manager who fired him was biased, but that the HR manager uncritically relied on reports from two of Staub's supervisors who were biased against him. Given the HR manager's undisputed lack of antimilitary animus, the question presented was what to do when the decisionmaker "has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." *Staub*, 131 S. Ct. at 1191. The Supreme Court concluded, "[I]f a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194 (footnotes and emphasis omitted).

Lobato reads *Staub* as announcing a categorical rule. He contends if a biased supervisor's animus in any way leads to an adverse employment decision,

---

[4] USERRA prohibits an employer from discharging an employee if the discharge was motivated by hostility to his obligations as a military reservist. 38 U.S.C. § 4311(a), (c). The *Staub* Court noted the similarities between USERRA and Title VII. *Staub*, 131 S. Ct. at 1191 ("[USERRA] is very similar to Title VII, which prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin' and states that such discrimination is established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'").

it is the proximate cause of that decision and thus the employer incurs liability—even if the employer conducts an independent investigation.

But *Staub* does not go this far. The *Staub* Court explained that a "necessary" element to a subordinate bias claim is the decisionmaker's uncritical "reli[ance]" on facts provided by a biased supervisor. *Id.* at 1193. If there is no such reliance—that is to say, if the employer independently verifies the facts and does not rely on the biased source—then there is no subordinate bias liability.

The Court did not specify which element is missing absent reliance on facts from the biased supervisor, but it is plain that the element is proximate cause. As the Court explained in another recent case:

> The term "proximate cause" is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability. "What we . . . mean by the word 'proximate,'" one noted jurist has explained, is simply this: "[B]ecause of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point."

*CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2637 (2011) (quoting *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting)). Further, the Court has acknowledged that it is necessary to limit cause given that, "[i]n a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 266 n.10 (1992). Embracing such a broad approach to cause "would result in infinite liability for all wrongful

acts, and would set society on edge and fill the courts with endless litigation."

*Id.*[5]

And here, there is a strong incentive not to stretch the limits of causation.

Otherwise,

> any time a biased employee . . . sets in motion the process that leads to an adverse employment action, the employer would be liable, even if the employer then conducted an entirely independent inquiry and decisionmaking process insulated from the animus of the biased employee, and no matter how compelling the nondiscriminatory grounds for taking the adverse employment action.

*Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th Cir. 2007).

*Staub* recognizes this problem and solves it. The Court explained that "the

supervisor's biased report may remain a causal factor *if* the independent

investigation takes it into account *without determining* that the adverse action

was, *apart from the supervisor's recommendation*, entirely justified." *Staub*, 131

---

[5] Lobato's evidence may suggest cause-in-fact—*i.e.*, whether, but for Lundstrom's initial report, Bentley and Romero would have known that Lobato submitted a false expense request or that Lobato engaged in other misconduct. But cause-in-fact, or "but-for" causation, is not the same as proximate cause. *See* David G. Owen, *The Five Elements of Negligence*, 35 Hofstra L. Rev. 1671, 1680–85 (2007). Proximate cause is "little more than a swirling maelstrom of policy, practicality, and case-specific fairness considerations." *Id.* at 1682. "The only purpose of adding a proximate cause requirement is to limit liability short of the full reach of but-for causation . . . ." Charles A. Sullivan, *Tortifying Employment Discrimination*, 92 B.U. L. Rev. 1431, 1432 (2012) (reviewing the effects of *Staub*). And in employment discrimination law, the Court has "adopted a more rigorous view of what proximate cause requires." *Id.* Thus, as we explained above, the Supreme Court requires reliance as a "necessary" element of a subordinate bias theory. *Staub*, 131 S. Ct. at 1193.

S. Ct. at 1193 (emphasis added). In short, an employer is not liable under a subordinate bias theory if the employer did not rely on any facts from the biased subordinate in ultimately deciding to take an adverse employment action—even if the biased subordinate first alerted the employer to the plaintiff's misconduct.[6]

With this understanding, we look to see if there is a genuine dispute about whether NMED relied on any facts from Lundstrom in deciding to terminate Lobato.[7] Again, *Staub* provides the answer.

There, the HR manager received two reports from two biased supervisors of Staub's alleged misconduct. Staub disputed the allegations to management, attributing them to his supervisors' impermissible bias. But the HR manager "did not follow up" on the dispute. *Staub*, 131 S. Ct. at 1190. When the second report

---

[6] Lobato suggests that the above analysis conflicts with *McKenna v. City of Phila.*, 649 F.3d 171 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1918 (2012), or *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 (6th Cir. 2012), which also address post-*Staub* Title VII subordinate bias theories. We disagree. Unlike here, in both *McKenna* and *Chattman*, the decisionmakers uncritically relied on information provided by a biased subordinate. *See McKenna*, 649 F.3d at 178–79 (the record suggested that the decisionmakers heard evidence only from the biased subordinate); *Chattman*, 686 F.3d at 353 (the biased subordinate "misinformed and selectively informed" the ultimate decisionmakers about the incident that triggered the adverse employment action).

Further, in *Chattman*, the plaintiff alleged that the biased subordinate selectively reported conduct violating company policy, and there, such violations were otherwise widespread. But Lobato has not alleged that Lundstrom selectively reported Lobato's misconduct.

[7] The *Staub* Court "express[ed] no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." *Staub*, 131 S. Ct. at 1194 n.4.

came, she simply "relied" on the biased supervisor's "accusation" and terminated Staub. *Id.* at 1189.

By contrast, here, there is no indication that Carlos Romero or Bentley ultimately relied upon Lundstrom's version of the facts. To the contrary, well before Lobato's termination, Romero detailed in a letter to Lundstrom that he did not credit any of Lundstrom's particular criticisms of Lobato. For example, Lundstrom accused Lobato of lying on his résumé. Instead of relying on Lundstrom's accusation, NMED conducted its own investigation into Lobato's conduct. As is detailed in Bentley's affidavit, NMED reviewed records available through a database for state employers and independently determined whether Lobato misrepresented when he had ended his time at the public defender's office. And Lobato does not dispute any of NMED's factual findings related to the résumé falsification issue; he disputes only that these factual findings actually demonstrate NMED's good faith belief that he lied on his résumé.[8]

The same holds true for the expense report issue. Again, Bentley did not rely on Lundstrom's accusation that Lobato was fraudulently claiming per diem expenses. Rather, she investigated the matter herself and even attempted to solicit (unsuccessfully) Lobato's point of view. She independently concluded that

_____

[8] Lobato does dispute that NMED conducted an independent investigation into the résumé falsification issue, but he fails to account for Bentley's database investigation.

Lobato did not stay at a hotel in Albuquerque, and—unlike Staub—Lobato does not dispute this underlying factual basis for his termination either.

Because there is no genuine dispute that NMED decided to dismiss Lobato after conducting an independent investigation without relying on facts from Lundstrom, we conclude this theory of Title VII liability fails.

### B. Other Claims

*New Mexico Human Rights Act.* The New Mexico Human Rights Act sets out the same standard for establishing wrongful discrimination as Title VII does. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 n.5 (10th Cir. 2005); *Cates v. Regents of N.M. Inst. of Mining & Tech.*, 954 P.2d 65, 69–70 (N.M. 1998).[9] Thus, because we conclude that Lobato has no Title VII claim, we also conclude he has no NMHRA claim.

*Whistleblower Protection Act.* Under New Mexico's Whistleblower Protection Act, a public employer may not take any "retaliatory action" against its employees for whistleblowing. *See* N.M. Stat. Ann. § 10-16C-3 (West 2013). To show that his termination was a "retaliatory action," Lobato invokes the evidence

---

[9] The Supreme Court recently established that for a Title VII retaliation claim, a plaintiff must establish that the defendant would not have taken the adverse employment action "but for" the impermissible motive. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013). The New Mexico Supreme Court has yet to interpret the New Mexico Human Rights Act as also imposing this standard. Because Lobato cannot demonstrate that bias or retaliation was a motivating factor in his dismissal, he cannot meet the higher standard established in *Nassar* either. Thus, we need not predict *Nassar*'s effect on New Mexico law.

presented for his Title VII claims. He says this evidence is sufficient to raise a jury question for his whistleblowing claim, too. Indeed, his arguments are identical to those he made in support of his Title VII claims. But as discussed above, those arguments and supporting facts are insufficient to raise a genuine dispute about whether NMED fired Lobato for any reason other than the nonretaliatory justifications provided in Lobato's dismissal letter. Accordingly, Lobato has not raised a genuine dispute of material fact for this claim either.

**First Amendment Retaliation.** Finally, Lobato alleges a First Amendment retaliation claim under 42 U.S.C. § 1983. He argues that his reporting of Misseri's misconduct, the Title VII violations, and the subsequent alleged retaliatory conduct was all protected speech for which he was fired.

This claim implicates the fourth prong of the five-prong test for First Amendment retaliation claims established in *Garcetti v. Ceballos*, 547 U.S 410 (2006). Under *Garcetti*'s fourth prong, "plaintiffs bear the burden of establishing . . . that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1236 (10th Cir. 2009). To prevail on this prong, Lobato essentially repeats his arguments from the Title VII context and adds that the temporal proximity between his complaints and his termination suggest that his protected speech was a motivating factor in Carlos Romero's decision to fire him. But the foregoing

-28-

demonstrates that Lobato's Title VII evidence and arguments are insufficient to raise a genuine dispute about whether Romero had nonretaliatory reasons for dismissing Lobato or whether Lundstrom impermissibly influenced Romero's decision. And "[w]ith regard to the need to show causation as part of the fourth prong of *Garcetti*, we have said that . . . mere temporal proximity of Plaintiff's protected speech to the adverse action is insufficient, without more, to establish retaliatory motive." *Id.* (internal quotation marks omitted). Thus, Lobato cannot establish the fourth prong of the *Garcetti* test, and this claim fails.

## III. Conclusion

For these reasons, we AFFIRM the judgment of the district court.