FILED
United States Court of Appeals
Tenth Circuit

December 23, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CHARLES E. AMOS,

     Plaintiff - Appellant,

v.

THE CITY OF CLAREMORE,

     Defendant - Appellee.

No. 15-5025
(D.C. No. 4:13-CV-00800-JED-TLW)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

     After the City of Claremore terminated his employment as a sanitation truck

driver, Charles E. Amos brought this action against the City seeking damages for

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17

(Title VII), and 42 U.S.C. § 1981. The district court granted summary judgment to

the City on these claims, and dismissed without prejudice his state-law claim for

intentional infliction of emotional distress. We affirm.

_____

     [*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

## BACKGROUND

In 2011, the City hired Mr. Amos, who is African-American, as a truck driver in its Sanitation Department. On Monday, April 22, 2013, after he had completed a full shift, his supervisor Darryl Simon asked him to stay on and assist in completing another route. Mr. Amos declined to do so, and left work.

On the next day, Tuesday, April 23, Mr. Amos called in sick. He did not come to work that day.

On Wednesday, April 24, Mr. Amos called Mr. Simon to tell him that he was going to miss work again because his wife had a medical appointment, and he was required to accompany her to the appointment. Later that day, Donnie Burgess, the City's Superintendent, signed a letter to Mr. Amos terminating his employment. The letter, drafted by Human Resources Director Carolyn Chapman, stated:

> Dear Charles:
>
> On Monday, April 22, 2013, you became frustrated with another employee and called Daryl Simmons [sic] and said "I've got things to do, I'm leaving, and I'm tired of this shit." When you left, the routes were not complete so you left the rest of the work crew in a bind. On Tuesday morning you called in "sick" and today you called Daryl Simmons [sic] at 7:20 to say that you were "taking your wife to the hospital."
>
> At 7:30, I called you to find out what the emergency was. You proceeded to tell me that "your wife has a procedure that you had to take her to". You did not prearrange your absence today. We talked about you leaving work early on Monday and you said that "you had something to do and that it was not your fault that the City couldn't keep four vehicles running."
>
> You have demonstrated significant displeasure with your co-workers and your job. It is natural for employees to be out of sorts on occasion but your attitude is infectious and influences the attitudes and actions of others. We have discussed your reluctance to be supervised and unwillingness to work effectively as part of the team on several previous occasions. We even met

2

with Human Resources to discuss the way the rest of the crew viewed your behavior. You promised to work on demonstrating more of a team effort.

I now believe that you are not productively working within the sanitation department team. This letter serves as official notice of your termination for "the good of the City of Claremore", effective today April 24, 2013. Please contact Human Resources concerning the impact of this action on your continued benefits.

Aplt. App., Vol. 2 at 310.

Mr. Amos subsequently requested and received a post-termination meeting with the City Manager, who declined to return him to his position in the Sanitation Department.

In this appeal, Mr. Amos attempts to cast doubt on the reasons for termination stated in the letter signed by Mr. Burgess. We agree with the district court that he has failed to demonstrate a genuine issue concerning whether the City's stated reasons for terminating his employment were pretextual. The district court therefore properly granted summary judgment in favor of the City on his Title VII and § 1981 claims.

**DISCUSSION**

"We review the district court's grant of summary judgment de novo, applying the same standard the district court applied and viewing the evidence in the light most favorable to the non-moving party." *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1196 (10th Cir. 2015). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

3

Because Mr. Amos's race-discrimination claims rely on circumstantial rather than direct evidence of discrimination, we analyze them using the familiar burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) ("A plaintiff may prove violation of Title VII or . . . § 1981—the standards are the same—either by direct evidence of discrimination, or by adhering to the burden-shifting framework of [*McDonnell Douglas*]." (citations omitted)). Under the *McDonnell-Douglas* approach, "the plaintiff must first establish a prima facie case of discrimination." *Id.* at 1195. "Then, the defendant may come forward with a legitimate, non-discriminatory . . . rationale for the adverse employment action." *Id.* Finally, "[i]f the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Id.*

Like the district court, we will assume without deciding that Mr. Amos established a prima facie showing of disparate treatment based on his race. In response, the City advanced legitimate business reasons for terminating Mr. Amos's employment: his poor attitude, shirking of his responsibilities by leaving work without helping with other routes on April 22, and failure to comply with the City's leave policies on April 23 and 24. We thus arrive at the third step of *McDonnell Douglas*: whether Mr. Amos showed that the City's proffered reasons were pretextual.

"A plaintiff may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's

4

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Id.* at 1196 (internal quotation marks omitted). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the situation." *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (alteration and internal quotation marks omitted). "Thus, the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (alteration and internal quotation marks omitted).

The letter from Mr. Burgess contains several reasons for terminating Mr. Amos's employment. "Where . . . an employer advances a number of reasons for an adverse employment action, we have adopted a general rule that an employee must proffer evidence that shows each of the employer's justifications is pretextual." *Id.* (internal quotation marks omitted).

### 1. Mr. Amos's Attitude

Mr. Amos contends that the reference to his negative attitude and behavior is unworthy of belief because his own supervisors were not concerned with his effect on morale, and because Ms. Chapman, who drafted the letter, had never personally witnessed or experienced any such behavior from him.[1]  Even if Ms. Chapman did

---

[1] Both of Mr. Amos's supervisors were African-American, while Ms. Chapman is white.

not personally witness Mr. Amos's negative attitudes or behaviors, however, his supervisors had witnessed such behavior and informed her of it. The supervisors relayed to her complaints from his co-workers that "he would not interact with them" that he was "angry and withdrawn," and their "frustration that he was antisocial." *Id.*, Vol. 1 at 100. Ms. Chapman stated that "according to the supervisors, it was becoming a problem [with] morale within the department." *Id.* at 101.

One of the supervisors, Mr. Simon, testified that he had received complaints from Mr. Amos's co-employees that Mr. Amos was belittling them. *Id.* at 113. Mr. Simon personally witnessed this belittling behavior. *Id.* at 114. Mr. Simon also testified that Mr. Amos had approached him with a "demanding attitude." *Id.* at 116.

Mr. Amos's other supervisor, Mr. Burgess, testified that "[y]ou could probably say the whole group" of Mr. Amos's co-workers came to him to complain "that Mr. Amos was anti-social and condescending." *Id.* at 134. Although Mr. Burgess stated that Mr. Amos's anti-social attitude didn't bother him, it *did* bother Mr. Amos's co-workers. *Id.* at 135. Also, like Mr. Simon, Mr. Burgess personally saw Mr. Amos act condescendingly to a co-worker. *Id.* at 136. He stated that Mr. Amos "tried to intimidate people" and "would try to belittle his workers that he was better than them or stuff like that." *Id.* at 140.

Mr. Amos also complains the City has the power to pursue such steps as verbal counseling, a written reprimand, suspension, and a last chance agreement prior to

6

termination, but failed to employ such procedures in his case.[2]  He asserts that this was because his supervisors did not believe that his behavior warranted any discipline.

Ms. Chapman testified that City employees are employed "at will," and that the City was not obligated to take lesser measures outlined in its disciplinary policy before terminating Mr. Amos's employment.  Thus, even if the City's decision to terminate his employment without first attempting lesser sanctions was "intemperate" or "unfair," this does not make it unworthy of belief.  *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) ("Because progressive discipline was entirely discretionary in such cases, and [the employer] . . . did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext.").

More importantly, even if Mr. Amos's supervisors were sufficiently unconcerned about his behavior to issue written warnings to him, it is uncontested that with time they became sufficiently concerned to go to Ms. Chapman.  Nor did they speak with her only once.  Ms. Chapman testified that she had a "number of

---

[2] There is evidence that the City verbally counseled Mr. Amos about his attitudes and behavior.  The termination letter refers to meetings his supervisors had with Mr. Amos about his negative attitude prior to termination, including a meeting with Human Resources.  Both Ms. Chapman and Mr. Burgess acknowledged these meetings in their testimony.  Aplt. App., Vol. 1 at 99-100, 136.  But apparently no written record was kept documenting them, and Mr. Amos denies that they occurred.  *Id.*, Vol. 2 at 258.  In reaching our decision, we have not relied on the verbal counseling Mr. Amos allegedly received.

7

conversations . . . with the two supervisors about [Mr. Amos's] ability to work within the department." Aplt. App., Vol. 2 at 281.

The supervisors eventually discussed terminating Mr. Amos's employment with Ms. Chapman. *See id.*, Vol. 1 at 149;[3] Vol. 2 at 284. Mr. Burgess subsequently read and signed the letter she drafted, understanding that it meant termination of Mr. Amos's employment. In light of all this, questions about whether Mr. Burgess had "hands-on" involvement in drafting the termination letter, or whether his supervisors had previously failed to impose written discipline on Mr. Amos, are insufficient to demonstrate pretext.

### 2. Departure from Work on April 22, 2013

Mr. Amos argues that the City's reliance on his decision to leave work on April 22, 2013, was unworthy of belief. He asserts that when he declined to stay he had already worked for over eight hours and had completed the duties assigned to him for that day. He argues that Mr. Simon merely *requested* that he stay late and there is no evidence that he was *required* to stay late to work on other routes. He also notes that Mr. Simon did not immediately punish him when he declined to stay.

---

[3] Mr. Burgess was initially asked at his deposition whether Ms. Chapman's letter was "the first time you learned that [Mr. Amos] was going to be terminated?" He answered, ambiguously, "No. I learned that once this letter was drafted up, it was recommended that he be terminated." Aplt. App., Vol. 2 at 251. The answer was ambiguous because "no" suggests that he did *not* learn for the first time upon reading the letter that Mr. Amos would be terminated. Mr. Burgess cleared up the ambiguity in his correction sheet to his deposition, striking his answer after the word "no," and adding the following language: "I knew we discussed he may be terminated but wasn't sure he had been until I received the letter and signed it." *Id.*, Vol. 1 at 149.

8

Mr. Amos claims that having completed his own route for the day, he was not obligated to assist on other routes. But at his deposition, he testified that it was expected that drivers would stay past 3:30 p.m. if necessary, so that the City could complete *all* routes for that day. *See* Aplt. App., Vol. 1 at 65. Also, it is undisputed that Mr. Amos's unwillingness to help left his work crew shorthanded.

The termination letter asserts that when asked to stay, Mr. Amos stated, "I've got things to do, I'm leaving, and I'm tired of this shit." *Id.*, Vol. 2 at 310. Although he denied stating, "I'm tired of this shit," Mr. Amos did not deny making the rest of the statement attributed to him. *Id.* at 261. His statement could be viewed as a callous or indifferent response to his co-workers' need for help in completing their assigned duties.

The City's failure to immediately discipline Mr. Amos when he refused to help does not show pretext. This is not a case where the City dredged up some long-forgotten, previously unpunished incident to justify a discriminatory termination. The incident was one of several sequential alleged derelictions of duty that took place *within a matter of days*. Ms. Chapman testified that when his supervisors came to her about Mr. Amos, they communicated to her that the three incidents in a row involving him were the "straw that broke the camel's back." *Id.* at 284. Mr. Amos's argument that his supervisors were required to punish him separately for each incident amounts to grasping at individual straws without acknowledging their cumulative effect on the camel. He has failed to show pretext in the City's reliance on his refusal to help on other routes.

9

### 3. Alleged Abuses of Leave Policy

#### A. April 23, 2013

Mr. Amos took this day off as a sick day. The City asserts that he failed to pre-arrange his absence. *See* Aplee. Br. at 23. But the City does not provide any record support for its contentions that sick leave for a sudden personal illness must be prearranged, or that Mr. Amos did not comply with the City's sick leave policies when he took leave on April 23.

Mr. Amos testified that he called in sick to Mr. Simon on the morning of the 23rd, within 20 minutes of the time his shift was scheduled to begin. The City's sick leave policy requires an employee "to personally notify his or her immediate supervisor within the first 30 minutes of their scheduled work day when the employee knows that he or she will need to use sick time." Aplt. App., Vol. 2 at 302. Thus, there is evidence that Mr. Amos properly complied with the sick leave policy on April 23.

The City cites no evidence that Mr. Simon disputed Mr. Amos's illness when he requested leave. He was granted sick leave for time-keeping purposes. Although the termination letter included quotation marks around the word "sick," suggesting the City doubted whether Mr. Amos was in fact ill,[4] the City fails to advance a factual basis for concluding that Mr. Amos was not in fact ill on the day in question.

---

[4] "Words used . . . ironically may be enclosed in quotation marks." William A. Sabin, *The Gregg Reference Manual* ¶ 236(a) (8th ed. 1996).

10

The district court concluded that "[r]ightly or wrongly, the City appears to have believed Amos was malingering," *id.* at 329, and that Mr. Amos failed to show that this conclusion was unworthy of belief. But in view of Mr. Amos's undisputed compliance with the City's sick-leave policy and the lack of evidence presented from which the City could reasonably have drawn a conclusion that he was malingering, the City's purported belief itself appears unworthy of belief. In sum, Mr. Amos has demonstrated a genuine factual dispute concerning whether the City's reliance on his use of sick leave on April 23 was pretextual.

Were this the City's *only* reason for terminating Mr. Amos's employment, we might have difficulty in affirming summary judgment. But as noted, this was merely one of several rationales contained in the termination letter. Given Mr. Amos's failure to show that the remaining grounds were pretextual, his showing that termination for his use of sick leave was unworthy of belief does not preclude the entry of summary judgment in favor of the City. *See Lobato*, 733 F.3d at 1289.[5]

### B. April 24, 2013

Mr. Amos argues that he complied with the City's policies when he took an absence from work due to his wife's doctor's appointment. He claims he had enough sick leave to be absent, and that he called in the morning of the appointment to inform Mr. Simon of his absence. Mr. Simon acknowledged that Mr. Amos left him a voicemail that morning notifying him of the pending absence.

---

[5] There are exceptions to the general rule that an employee must show that each of the employer's justifications is pretextual, *see Lobato*, 733 F.3d at 1289, but Mr. Amos fails to show that any of them apply here.

But at his deposition, Mr. Amos admitted that his wife's medical procedure had been scheduled two weeks before he called the City to request time off. Aplt. App., Vol. 1 at 67-68. And Mr. Simon testified that until the 24th, Mr. Amos had not informed him of the scheduled procedure.

In defense of his last-minute notice, Mr. Amos asserts that he "had just recently learned the specifics of his wife's medical appointment and [that he] was required to accompany her." Aplt. Br. at 3. But the citation he provides, to Mr. Simon's deposition, does not factually support his claim that he only belatedly discovered his need for leave. He also cites the City's sick-leave policy, which only requires an employee to notify his or her immediate supervisor within the first 30 minutes of a work day when he knows that he will need to use sick time.

The question here is not whether the City's reliance on Mr. Amos's failure to preapprove his absence was reasonable or in technical compliance with the sick-leave policy, but whether it was pretextual. The City's citation of the April 24 absence must be considered within the context of the entire termination letter, which emphasized Mr. Amos's failure to act as a "team player." It is clear from the letter that his supervisors believed that his absence from work on April 24 was just one more example of this failure. They concluded—whether correctly or not—that he knew in advance that he would need to have the time off, but failed to notify them until the day of the appointment.

This reasoning is qualitatively different from relying on Mr. Amos's need to take leave for a sudden illness on April 23, which he arguably could not have

12

anticipated. As the letter makes clear, within the span of three days, Mr. Amos had refused to pitch in and help his co-employees as expected (April 22), and had failed to report for work under circumstances where his supervisors believed he could have and should have provided advance notice (April 24). These actions took place under the cloud created by the City's perception of Mr. Amos's general bad attitude. Whether or not the City's reasons were wise, fair, or correct, Mr. Amos failed to show that they were pretextual.

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge