FILED
United States Court of Appeals
Tenth Circuit

April 13, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TAMMIE ROBINSON,

     Plaintiff - Appellant,

v.

ST. JOHN MEDICAL CENTER, INC.;
ST. JOHN HEALTH SYSTEM, INC.,

     Defendants - Appellees.

No. 15-5039
(D.C. No. 4:12-CV-00109-JED-FHM)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **GORSUCH**, **MATHESON**, and **MORITZ**, Circuit Judges.
_____

Tammie Robinson appeals the district court's grant of summary judgment in

favor of her former employer, St. John Medical Center, Inc., and St. John Health

System, Inc. (collectively, "SJMC"), on her claims alleging race discrimination,

retaliation, and wrongful termination in violation of public policy. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.    Background

Robinson is an African American woman and a registered nurse. She worked for SJMC, a hospital in Tulsa, Oklahoma, at different times during her nursing career, most recently from December 2008 through March 15, 2011. In 2010, Robinson applied for the position of registered nurse case manager, a job that didn't involve providing primary nursing care to patients. The director of case management, Sammye Valenzuela, interviewed and hired Robinson for this position.

In March 2011, SJMC admitted a patient with sickle cell anemia ("the patient"). The patient's treatment team included the attending physician, Dr. Ali Mohammad, and several resident physicians. Dr. Mohammad asked the palliative care team—consisting of a physician, a registered nurse, and a social worker—to consult with the patient after she complained of pain and asked for intravenous ("IV") pain medication. Due to concerns about the patient's potential opioid abuse and a need for better pain management, the palliative care team recommended the patient transition to oral medication. After several meetings with the palliative care team, the patient indicated she wanted to discontinue receiving treatment from that team.

Robinson, a case manager in the unit where the patient was being treated, became concerned that the patient's physicians and palliative care team weren't adequately treating the patient's pain, and she took several actions regarding the patient's treatment without first obtaining physician approval. Six physicians and one nurse ultimately complained about Robinson's conduct.

2

On Friday, March 11, 2011, Dr. Mohammad requested a meeting with Valenzuela and Robinson concerning Robinson's involvement in the patient's treatment. During that meeting, which two resident physicians also attended, Dr. Mohammad complained that Robinson had repeatedly questioned the resident physicians as to why the patient wasn't on antibiotics, why she didn't have an IV pain pump, and why a hematologist hadn't been consulted. Dr. Mohammad also indicated his awareness that, without any direction from a physician, Robinson had contacted a sickle cell treatment facility in Texas and obtained information about a physician at that facility. Robinson responded that she also had asked an SJMC infectious disease specialist, who was not on the patient's treatment team, whether the patient needed IV antibiotics. Dr. Mohammad replied that it was his decision, not Robinson's, whether to consult other physicians. After Robinson volunteered that she had asked the patient whether she was willing to have an IV pain pump, Dr. Mohammad reacted angrily, characterizing Robinson's behavior as unacceptable and stating that her actions had undermined his role as a physician.

After Dr. Mohammad left the meeting, Valenzuela advised Robinson of the seriousness of the situation and indicated she would follow up with Dr. Mohammad and the human resource department ("HR"), and speak to Robinson again the following Monday. That same day, Valenzuela spoke to an HR representative about Robinson's conduct with respect to the patient. The HR representative responded

3

that SJMC's progressive disciplinary policy permitted Valenzuela to either apply the last step before termination[1] or terminate Robinson's employment.

Valenzuela spoke to Dr. Mohammad again on Monday, March 14. Dr. Mohammad reiterated that Robinson had worked against the patient's treatment plan and he also reported that the patient was refusing to take medication she didn't want and had asked why she wasn't receiving IV medication. Dr. Mohammad indicated that Robinson's actions had placed a wedge between the patient and the hospital.

Later that day, Valenzuela met with a physician and nurse from the palliative care team. They reported that without a request from any SJMC physician, Robinson had looked into obtaining a hematologist for the patient in Oklahoma City and asked a social worker to determine whether transportation to Oklahoma City could be arranged for the patient. The team felt that Robinson's actions had given the patient conflicting options and disrupted the patient's care. Valenzuela also met with SJMC's medicine section chair and director of inpatient services, who agreed that Robinson's actions had been disruptive and interfered with the patient's care. At some point on March 14, Valenzuela conferred again with the HR representative regarding Robinson's actions. The next day, Valenzuela spoke to an additional resident physician who hadn't attended the March 11 meeting. The resident repeated some of the previous complaints regarding Robinson's conduct.

---

[1] The record indicates the last step before termination is a "Decision-Making Leave." At that step, "[t]he employee is instructed to take the day off with pay to make a decision about his/her commitment to his/her job." Aplt. App., Vol. II at 400.

In a meeting with Robinson on March 15, Valenzuela terminated Robinson's employment. SJMC's standard progressive disciplinary action form, completed by Valenzuela, indicated Robinson had acted outside the scope of her position by taking the following actions without first discussing them with a physician and without a physician's order: 1) asking the patient if she was willing to have an IV pain pump; (2) arranging for the patient to consult with a Texas physician; (3) seeking a hematologist for the patient in Oklahoma City and asking a social worker to look into transportation; and (4) asking an infectious disease physician at SJMC whether the patient needed IV antibiotics. The disciplinary action form also identified several business reasons for terminating Robinson, including the need to (1) maintain appropriate physician-patient relationships, (2) avoid disruptions in the patient's care and treatment plan, (3) avoid extending the patient's stay; and (4) promote positive patient outcomes and satisfaction. *Id.*

Robinson filed this action asserting claims under Title VII, 42 U.S.C. §§ 2000e-2(a)(1) & 2000e-3(a), 42 U.S.C. § 1981, and state law, claiming that SJMC terminated her based on her race, in retaliation for her complaining about race discrimination, and in violation of Oklahoma public policy. The district court granted summary judgment in favor of SJMC on all claims. Robinson appeals.

## II.    Discussion

### A.    Standard of Review

"We review the district court's grant of summary judgment de novo, applying the same standard used by the district court." *Riggs v. AirTran Airways, Inc.*,

5

497 F.3d 1108, 1114 (10th Cir. 2007).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In making this determination, we view the evidence in the light most favorable to [Robinson], the non-moving party, and draw all reasonable inferences in her favor."  *Riggs*, 497 F.3d at 1114.

### B.      Race Discrimination and Retaliation Claims

Robinson alleges SJMC terminated her employment because of her race and in retaliation for her report of race discrimination.  Specifically, in support of her retaliation claim, Robinson asserts that approximately five weeks before her termination, another nurse said to her "you could never be a dumb blond, play the dumb blond" and also asked "isn't there another black case manager who's loud and assertive?"[2]  *Id*. at 304.  Robinson asserts that she reported these comments to Valenzuela and that Valenzuela reacted negatively to her report.  Valenzuela denies that Robinson ever complained about race discrimination.

The district court concluded that Robinson and SJMC met their respective burdens of establishing a prima facie case and articulating a legitimate, nondiscriminatory reason for the termination.  *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1288-89 (10th Cir. 2013).  But the court granted SJMC summary judgment after finding Robinson failed to show a genuine issue of material fact as to

---

[2] Robinson doesn't describe the context in which these statements were made.

6

whether SJMC's proffered reasons for terminating her employment were pretext for discrimination or retaliation.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1289 (internal quotation marks omitted). "[W]e examine the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the situation." *Id.* (internal quotation marks and brackets omitted). "Thus, the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (internal quotation marks and brackets omitted). Moreover, a plaintiff generally "must proffer evidence that shows each of the employer's justifications are pretextual." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005) (internal quotation marks omitted).

Robinson contends that the district court didn't address some of her pretext evidence, erred in assessing other evidence, and failed to consider her evidence as a whole. We address each of her assertions of error below.

### 1. Evidence that Robinson's Conduct was Consistent with her Job Description

Robinson contends that a jury could conclude, based on the terms of her job description, that she never acted outside the scope of her case manager position;

7

therefore, SJMC's reasons for terminating her were false. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir 2000) (noting a plaintiff can show pretext "with evidence that the defendant's stated reason for the adverse employment action was false"). But Robinson fails to point to any evidence suggesting SJMC didn't honestly believe she acted outside the scope of her position.

Moreover, the record amply demonstrates otherwise. Dr. Mohammad complained to Valenzuela that Robinson's actions undermined the physician's role, interfered with the physicians' treatment plan, and drove a wedge between the patient and the hospital. The medical director of the palliative care team complained to Valenzuela that Robinson had given the patient conflicting options and disrupted the patient's care. Yet another physician advised Valenzuela that Robinson's conduct disrupted and interfered with the patient's care. Further, Valenzuela testified that Robinson's conduct fell outside her scope of practice because, according to "[t]he fundamentals of nursing," a nurse works under a physician's direction. *Id.*, Vol. III at 491. While Robinson characterized her job description differently, Valenzuela disagreed with that description. More importantly, Robinson's contrary interpretation fails to demonstrate that SJMC did not sincerely believe that she acted outside the scope of her position.

### 2. SJMC's Failure to Cite Any Written Rules Violated by Robinson

Robinson next argues that SJMC's failure to suggest that her conduct violated any written rule or policy demonstrates that its proffered reasons for terminating her

were pretextual. We are not persuaded. Although SJMC admitted it cited no written rule precluding Robinson's specific conduct here, we have rejected the premise upon which Robinson bases her argument—i.e., "that an otherwise reasonable justification for a business decision somehow loses its legitimacy simply because it reflects an exercise of managerial judgment rather than a ministerial execution of written policy." *Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1192 (10th Cir. 2010) (questioning the plaintiff's assertion that an employer cannot legitimately fire an employee for misconduct "absent a formal company policy specifically addressing such misconduct," *id*. at 1193.). As we explained in *Medlock*, "this facially untenable idea . . . is belied by countless employment discrimination cases decided on the basis of legitimate business justifications without any reference to formal policies necessarily legitimizing those justifications." *Id*.

### 3. Evidence that SJMC Failed to Follow its Progressive Disciplinary Policy

Robinson additionally contends that SJMC's failure to follow its progressive disciplinary policy, which she claims forbids immediate termination, is evidence of pretext. *See Kendrick*, 220 F.3d at 1230 (noting a plaintiff can show pretext "with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances"). But SJMC's policy explicitly allows for termination without prior discipline in cases involving "[a]ctions or displayed conduct detrimental to job performance or patient care." Aplt. App., Vol. II at 408. Although Robinson now maintains that SJMC never relied

9

on this provision to justify her termination, she ignores Valenzuela's testimony establishing otherwise. *See id.*, Vol. III at 489-90 (citing this provision of the progressive disciplinary policy).

Robinson also contends that SJMC's progressive disciplinary policy required Valenzuela, during the termination meeting, to provide her with a written statement of the reasons for her termination and an opportunity to comment. She claims that Valenzuela did neither and that, given the opportunity, she would have denied the allegations. She reasons that SJMC's failure to allow her to respond resulted in an incomplete investigation, which she argues is evidence of pretext.

But the record shows that the physicians directly confronted Robinson in the March 11 meeting with most of the allegations supporting her termination. *See id.* at 423-25. She argues she had no opportunity to respond at that time because Dr. Mohammad dictated the order of who would speak and then walked out before she could speak. Yet Robinson's notes regarding the meeting show that she not only spoke during the meeting but that she had an opportunity to address the allegations with Valenzuela even after Dr. Mohammad left. *See id.*, Vol. I at 225-26. Moreover, although Robinson claims she would have denied the allegations, she doesn't dispute that she engaged in the conduct that led to the physicians' complaints. Instead, she disagrees only with SJMC's business judgment that her actions were outside the scope of her position. Thus, she fails to demonstrate that SJMC's investigation was so inadequate as to support an inference of pretext. *Compare Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 543 (10th Cir. 2014) (holding employer's failure to

10

obtain the plaintiff's account of "what transpired" during a quarrel with a co-employee, resulting in an inadequate investigation of the reason for his termination, could permit a jury to infer pretext when combined with evidence of disparate treatment of a similarly situated employee), *with Riggs*, 497 F.3d at 1119 (holding employer's failure to allow plaintiff to respond regarding a customer complaint was not a "disturbing procedural irregularity" tending to show pretext where employer had previously addressed the customer incident with the plaintiff and she was the only employee fitting the customer's description).

### 4. Evidence that SJMC Treated Robinson Differently than Similarly Situated Employees

Robinson next argues the district court improperly resolved factual issues in concluding that her evidence of disparate treatment didn't support a finding that other employees' situations were sufficiently similar or that they had "violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232.

Robinson points to evidence that she says establishes that five other caucasian employees supervised by Valenzuela each committed offenses similar to hers but were not treated similarly. Two of those individuals were disciplined for alleged HIPAA[3] violations (J.M. and P.E.) and three were disciplined for performance-related actions (J.H., J.E., and again, P.E.). Robinson also points to a fifth individual, R.M., who although she was terminated for performance-related issues, was first disciplined.

_____

[3] Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936.

Regarding J.M. and P.E., Robinson suggests that their actions in disobeying a federal law were more serious than any of her conduct. Thus, she argues the district court erred in concluding her allegations would not permit an inference of pretext. But Robinson misplaces the focus of her argument on her own evaluation of the seriousness of other employees' conduct.

While a plaintiff may show pretext on a theory of disparate treatment, *id.*, the ultimate question is whether *SJMC* considered the other employees' offenses to be comparable to Robinson's conduct, *see Riggs*, 497 F.3d at 1121 (rejecting plaintiff's contention that other employees' infractions were "egregious and immediately terminable" where there was no evidence the employer considered them as egregious as plaintiff's conduct involving customer mistreatment). "A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct. Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Kendrick*, 220 F.3d at 1233 (internal quotation marks omitted). Moreover, SJMC's progressive disciplinary policy provides that coaching is an appropriate level of discipline for some HIPAA violations. *See* Aplt. App., Vol. II at 409.

Robinson has failed to present evidence that Valenzuela considered the other case managers' HIPAA violations to be similar to or as serious as her conduct and this argument also fails.[4]

Robinson also maintains that several case managers (P.E., J.H. and J.E.) acted similarly to her but they were not immediately terminated. But Robinson fails to acknowledge the significant factual distinctions between the other employees' circumstances and her own. *See Kendrick*, 220 F.3d at 1232-34 (noting substantial differences in the plaintiff's and another employee's circumstances, although both violated arguably comparably serious work rules). For instance, while Robinson points out that Valenzuela disciplined J.E. for failing to carry out a physician's order, she fails to point out that J.E. disputed receiving that order. And she doesn't develop an argument as to the similarity, if any, between her circumstances and those of P.E. and J.H. It is not sufficient for Robinson to simply assert that other employees had performance issues but weren't terminated. *See id*. at 1234 (holding that substantial differences between plaintiff's and other employee's circumstances precluded a finding there was sufficient evidence to create a genuine issue of material fact concerning pretext).

---

[4] Robinson points out that witness Mary Martin testified that she views misconduct violating federal law as more serious than other misconduct. *See* Aplt. App., Vol. II at 360-61. Robinson doesn't identify Martin's role or position, but it appears from the cited testimony that she is a "nurse manager" at SJMC. *See id.* at 360. Robinson fails to suggest, however, that Valenzuela shared Martin's opinion. Nor does she show that any employee who reported to Martin and was treated differently would have been similarly situated to herself. *See Kendrick*, 220 F.3d at 1232 (10th Cir. 2000) (stating employees are similarly situated if they "deal[] with the same supervisor").

13

As evidence of Valenzuela's inconsistent actions towards her, Robinson points out that Valenzuela terminated R.M. for altering a physician's order, but did so only after coaching her over two previous incidents—the first after R.M. gave prescribed medicine valued at $350 to a patient who could not afford to pay for it without obtaining appropriate approval, and the second when she made racial comments to a co-worker. Importantly, Robinson ignores the considerable distinguishing circumstances of R.M.'s previous incidents of misconduct. And Robinson fails to point to any evidence that SJMC considered these incidents to be as serious as her own actions, which SJMC concluded were outside the scope of her position and detrimental to the patient's care. More importantly, Robinson acknowledges that Valenzuela terminated R.M. after a physician complained that R.M. had altered the physician's written order regarding hospice care for a patient without first obtaining the physician's permission. Thus, the bottom line is that Valenzuela terminated R.M. for conduct similar to Robinson's, and SJMC's treatment of R.M. "is close enough to be comparable," *id.* at 1233.

Simply stated, Robinson points to no evidence that comes even close to approaching the circumstances here—that is, a case manager who acted outside of her position in multiple and distinct ways and in a manner that resulted in six physicians and one nurse complaining to Valenzuela about her conduct. Under these circumstances, the district court did not err in holding that Robinson failed to show that similarly situated employees were treated differently.

14

### 5. Evidence of Inconsistencies in SJMC's Reasons for Terminating Robinson

Next, Robinson contends SJMC made false and inconsistent statements that would allow a jury to infer that its reasons for terminating her were pretextual. In support, Robinson maintains that the disciplinary action form documenting her termination indicated she had not been coached,[5] but that SJMC later falsely asserted—in a filing with the EEOC and in Valenzuela's deposition testimony—that she had been coached. Robinson denies any previous coaching, and she argues that SJMC's changed position on this issue is evidence of pretext. *See Jaramillo*, 427 F.3d at 1309-10 (discussing circumstances when employer's changed explanation for the adverse employment action is evidence of pretext).

But the record doesn't support Robinson's claim that SJMC changed its position after the fact. It is true, as Robinson points out, that the disciplinary action form documenting Robinson's termination indicated "None" in response to a question asking for "[d]ates of previous discussions *concerning this issue*." Aplt. App., Vol. II at 390 (emphasis added). But the coaching Valenzuela referred to in her deposition, using her own historical notes, didn't concern Robinson's termination. Instead, it concerned Valenzuela's conversation with Robinson regarding Robinson's working relationship with the nursing staff in a specific unit of the hospital. *See id.*, Vol. III at 485-86. SJMC attached Valenzuela's notes

---

[5] Coaching is an informal disciplinary action under SJMC's progressive disciplinary policy involving "a planned discussion between a manager and employee about the need to correct a problem and improve performance." Aplt. App., Vol. II at 395.

15

regarding the alleged coaching to its EEOC filing and noted that Valenzuela had counseled Robinson not to cross boundaries and to take a team approach. Although Robinson denies that any such coaching occurred, whether formally or informally, the evidence she cites doesn't show a contradiction between Valenzuela's testimony and notes and the disciplinary action form documenting her termination.

Robinson also asserts that SJMC falsely stated in its EEOC filing that "the patient 'fired' the palliative care team because they were not giving her the medication recommended by" Robinson. *Id.*, Vol. II at 439. Robinson points to evidence that the patient dismissed the palliative care team before Robinson talked to the patient about an IV pain pump. She contends this false statement is evidence of pretext because a jury could see it as evidence that SJMC attempted to exaggerate Robinson's misconduct.

But Robinson doesn't identify where in the record she raised this issue, as required by our local rule. *See* 10th Cir. R. 28.2(C)(2) ("For each issue raised on appeal, all briefs must cite the precise reference in the record where the issue was raised and ruled on."). And our review of the record indicates she didn't raise this particular pretext contention in the argument section of her brief in opposition to summary judgment. Thus, Robinson didn't sufficiently raise this issue in the district court to preserve it for appellate review. *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1150 (10th Cir. 2012). Nor does Robinson make any effort to show plain error as to this issue. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011)(noting we will reverse based on new issue raised for first time

16

on appeal only if appellant satisfies plain error standard of review). This failure "marks the end of the road for an argument for reversal not first presented to the district court." *Id.* at 1131.[6]

### 6. Evidence that Valenzuela Denied that Robinson Complained About Race Discrimination

Robinson claims that about five weeks before SJMC terminated her employment, she reported to Valenzuela that another employee had said to her "you could never be a dumb blond, play the dumb blond" and "isn't there another black case manager who's loud and assertive." Aplt. App., Vol. II at 304. Robinson contends that when she reported these comments Valenzuela told her to "forget about what she said." *Id.* According to Robinson, Valenzuela "seemed angry with me, as if I'd done something wrong for telling her that." *Id.* Valenzuela denied that Robinson ever reported a racial comment made by another employee. *See id.*, Vol. III at 493. Robinson argues that a jury could infer pretext based upon Valenzuela's hostility toward her discrimination complaint and her later assertion that Robinson had not reported any racial comments.

We are not persuaded. "To raise an inference of pretext in the face of the employer's legitimate, nondiscriminatory explanation, the plaintiff must undermine

---

[6] In a related argument, Robinson argues the disciplinary action form inaccurately stated that she clearly understood the rule or policy she violated. But regardless of whether Robinson misunderstood the rule or policy she violated, she fails to point to any evidence indicating that SJMC didn't sincerely believe she understood the most basic fundamentals of nursing—i.e., that a nurse acts under the direction of a physician.

the employer's credibility to the point that a reasonable jury could not find in its favor." *Jaramillo*, 427 F.3d at 1310. Here, SJMC's proffered overall reason for Robinson's termination—that she acted outside the scope of her position on numerous occasions, as reported by multiple physicians and one nurse—is supported by the record. *See id.* at 1312. And notably, SJMC has consistently offered this explanation. *See id.* at 1310-11 (noting employer had not pursued a "shotgun approach" by proffering "a significant number of pretextual reasons"). Moreover, the fact that Valenzuela both hired and terminated Robinson in a relatively short time frame gives rise to "a strong inference" (but not a presumption) that SJMC's stated reasons for her termination are not pretextual. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (internal quotation marks omitted).[7] On this record, Robinson's attack on Valenzuela's credibility doesn't raise a genuine question of pretext such that a reasonable jury could not find in SJMC's favor. *See Jaramillo*, 427 F.3d. at 1310.

To summarize, whether considered individually or as a whole, Robinson's pretext evidence doesn't show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in SJMC's proffered legitimate reasons for her termination. *Lobato*, 733 F.3d at 1289 (internal quotation marks omitted). Robinson has failed to raise a genuine issue as to whether SJMC's stated and consistent reasons

---

[7] Robinson argues a court can't draw this so-called "same actor inference" in favor of an employer on summary judgment. *Antonio*, 458 F.3d at 1183 (internal quotation marks omitted). But we have recognized this inference in a summary judgment case and concluded that the employee's pretext evidence didn't dispel it. *See id.*, at 1183-84.

18

for her termination are "an attempt to mask an illegitimate motive." *Jaramillo*, 427 F.3d at 1312. We therefore affirm the district court's grant of summary judgment to SJMC on Robinson's race discrimination and retaliation claims.

### C.      Wrongful Termination in Violation of Oklahoma Public Policy

Finally, Robinson contends that SJMC terminated her employment in retaliation for reporting to Valenzuela and others her concern that physicians were withholding treatment from the patient because, as stated by one of the resident physicians, the patient didn't "warm their hearts." Aplt. App., Vol. II at 314. She argues her termination thus violated a clear mandate of public policy and constituted an actionable state tort claim under the rationale of *Burk v. K-Mart Corp.*, 770 P.2d 24 (Okla. 1989).

*Burk* recognized a "public policy exception to the at-will termination rule in a narrow class of cases in which the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law." *Id.* at 28. But *Burk* further recognized that "the vague meaning of the term public policy," requires that this exception to at-will employment "be tightly circumscribed." *Id.* at 28-29; *see also Vasek v. Bd. of Cty. Comm'rs of Noble Cty.*, 186 P.3d 928, 932 (Okla. 2008) (setting out elements of viable *Burk* claim).

The district court granted summary judgment to SJMC on this claim, holding that Robinson failed to point to evidence that she reported a concern that physicians were withholding care from the patient. On appeal, Robinson maintains that she told Valenzuela that a physician was conditioning treatment on the patient's ability to

19

warm their hearts. But as the district court noted, the testimony she relies on is rambling and vague, and doesn't clearly support her contention. Nor did Robinson make any effort in the district court to clarify her statements. Instead, she filed an affidavit opposing summary judgment that didn't mention much less clarify her allegation that she reported a concern that physicians were withholding treatment from the patient.

Robinson thus failed to meet her burden to come forward with evidence that she "refus[ed] to act in violation of an established and well-defined public policy or . . . perform[ed] an act consistent with a clear and compelling public policy." *Burk*, 770 P.2d at 29.[8] We affirm the district court's grant of summary judgment to SJMC on Robinson's wrongful termination claim.

---

[8] In any event, even if Robinson could point to evidence that she reported a concern to Valenzuela that physicians were withholding care from the patient, she has not identified "a specific, well-established, clear and compelling public policy" that SJMC violated by terminating her. *Barker v. State Ins. Fund*, 40 P.3d 463, 468-69 (Okla. 2001). She cites two sections of the Oklahoma Nursing Practice Act that define a nurse's general duty of care and penalties for failure to meet that standard. *See* Okla. Stat. tit. 59, §§ 567.8, 567.9. But these provisions don't support her *Burk* claim. *See Barker*, 40 P.3d at 470 ("Unless a statute specifically articulates an *established and well-defined* Oklahoma public policy, the statute may not be relied upon to support a common law *Burk* tort."); *see also Prince v. St. John Med. Ctr.*, 957 P.2d 563, 566 (Okla. Civ. App. 1998) (holding decisional law that "clearly placed a duty of care" on a hospital was nonetheless insufficient to support a *Burk* tort claim because "what that duty entails in a particular circumstance is not as clear"). In light of *Burk*'s explicit admonition that the public policy exception be tightly circumscribed and reserved for violations of established and well-defined public policy, we conclude Robinson's reliance on the cited statutes "is far too slender a reed upon which to base a public policy tort." *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1488 (10th Cir. 1996) (internal quotation marks omitted).

20

The district court's judgment is affirmed.

Entered for the Court


Nancy L. Moritz
Circuit Judge